Filed 12/7/21  Rose v. County of Fresno CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MELISSA ANN ROSE et al., Plaintiffs and Respondents, v. COUNTY OF FRESNO, Defendant and Appellant. | F079483 (Super. Ct. No. 17CECG02164) **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth, Todd W. Baxter; Overstreet & Associates David M. Overstreet and Chester E. Walls for Defendant and Appellant.

Miles, Sears & Eanni, Douglas L. Gordon and Lyndsie N. Russell for Plaintiff and Respondent Melissa Ann Rose.

Fowler Helsel Vogt and John C. Fowler for Plaintiff and Respondent David Bray.

-ooOoo-

Defendant County of Fresno (County) appeals from a jury verdict in favor of two bicyclists who fell and were injured in March 2017 when they encountered sand blocking Auberry Road's northbound bike lane.  County contends (1) the trial court erred in

admitting expert opinion testimony about how long the sand had been in the bike lane because there was no basis in fact for the opinion; (2) the hazard was obvious as a matter of law and, therefore, the sand did not meet the statutory definition of a "dangerous condition";[1] (3) the primary assumption of risk doctrine protects it from liability because it did not unreasonably increase the risks to plaintiffs beyond those inherent in road bicycling; and (4) the trial court erred in rejecting its proposed jury instructions setting forth Vehicle Code provisions applicable to bicyclists.

We conclude the trial court did not abuse its discretion in concluding a registered environmental health specialist qualified as an expert and in admitting his opinion on how long the sand had blocked the bike lane. We further conclude the trial court properly determined the jury should decide (1) whether the sand constituted a dangerous condition of public property and (2) whether County unreasonably increased the risks inherent in road bicycling. Lastly, County has not demonstrated the court's refusal to give its proposed instructions quoting certain Vehicle Code provisions was prejudicial error.

We therefore affirm the judgment.

## FACTS

*County's Roads and Policies*

Fresno County is one of the largest counties in the state, and it has more miles of road than any other county. County's Roads Department handles road maintenance, which includes addressing surface hazards, for approximately 3,500 miles of roadway.

California law requires local governments to adopt a long-term general plan and requires such plans to include a circulation element. (§§ 65300, 65302, subd. (b).) Beginning in 2011, the circulation element was required "to plan for a balanced,

---

[1] " 'Dangerous condition' " is defined by Government Code section 830, subdivision (a). Unlabeled statutory references are to the Government Code.

multimodal transportation network that meets the needs of all users of streets, roads, and highways for safe and convenient travel in a manner that is suitable to the rural, suburban, or urban context of the general plan." (§ 65302, subd. (b)(2)(A).) The term "user" includes pedestrians, bicyclists, motorists and others. (§ 65302, subd. (b)(2)(B).) In accordance with the statutory requirements, the Fresno County General Plan contains a transportation and circulation element that sets forth County's policies and objectives for bicycle use. Section D of that element addresses bicycle facilities and acknowledges the increased use, acceptance and importance of bicycles as a means of recreation, transportation and healthful exercise. The element's policies "seek to provide a safe, continuous, and easily accessible bikeway system that connects cities to other communities, to major facilities, and to recreational areas and regional parks [and] strive to establish bikeways along existing recreational bicycling routes, to encourage safety-oriented design, to link bikeways to other modes of transportation, and to provide adequate funding." Section D contains Policy TR-D.1, which states that "County shall implement a system of recreational, commuter, and inter-community bicycle routes in accordance with the Regional Bikeway Plan." Policy TR-D.7 states: "County shall construct and maintain bikeways to minimize conflicts between bicyclists and motorists."

The General Plan's implementation program includes Program TR-D.C, which states: "County shall require that sufficient pavement width for bikeways shown on the Regional Bikeway Plan be constructed in conjunction with road construction projects." Program TR-D.D states: "County shall use California Department of Transportation (Caltrans) bikeway design standards as guidelines for construction of Class I, II, III bicycle facilities."

The "Fresno County Regional Bicycle & Recreational Trails Master Plan" was adopted in September 2013 (Regional Bikeway Plan) by County's Board of Supervisors, which certified "its compliance with State law and the October 2000 Fresno County General Plan." The Regional Bikeway Plan describes the different classes of bikeways.

3.

Class I bikeways also are known as multiple purpose paths or trails and are shared by cyclists, pedestrians, and joggers, but not vehicles. Class II bikeways or bicycle lanes are the class involved in this litigation. They are one-way lanes paired on opposite sides of the street to facilitate two-way travel. Cyclists travel in their own lane, separated from traffic by a white stripe six inches wide. Class II bicycle lanes "on paved shoulders are commonly found on rural roads without curbs and sidewalks. Shoulder bikeways provide a paved shoulder for the bicyclist to travel outside of the travel lane. The County uses the minimum width for a typical Shoulder Bicycle Lane per California Highway Design Manual, CA-MUTCD, and AASHTO standards."[2]

The Regional Bikeway Plan includes Goal BP-D, which states: "Improve bicycling safety, reduce bicycle-related collisions, establish educational opportunities aimed at all levels of bicyclists, and promote safer driving behaviors among cyclists and motorists." Policy BP-D.1 states: "Provide bikeway maintenance such as pavement repairs, striping, signage, tree trimming, debris removal, and any other upkeep as financially feasible."

*The Accident Location*

Plaintiffs' bicycling accident occurred on northbound Auberry Road, about 0.6 miles south of Frontier Road. Auberry Road is a two-lane, paved roadway with designated bike lanes in each direction and a speed limit of 55 miles per hour. Auberry Road is commonly used for road bicycling because it is accessible to urban areas, has bike lanes, and provides access to higher elevation riding. The bike lanes were designed to be four feet wide, were separated from vehicle traffic by a six-inch white stripe, and were constructed in 1995. As actually built, the width of the bike lane varies. At the accident location, the road curves to the right and the width of the bike lane tapers from

---

**2** CA-MUTCD refers to the California Manual on Uniform Traffic Control Devices and AASHTO refers to the American Association of State Highway and Transportation Officials.

4.1 feet to 3.6 feet within a 65-foot stretch and then tapers to 2.9 feet. These distances were measured from the center of the six-inch stripe marking the bike lane to the base of the sloped asphalt berm that separates the bike lane from the earth and shoulder to the right of the road. The asphalt berm was approximately four inches high at the accident location.

County owns an easement that contains Auberry Road and it controls and maintains the roadway. County allows the general public access and use of the roadway and bike lanes. County's Roads Department divides its maintenance operations into areas. Area 11, where the accident occurred, contains approximately 187 miles of road, or about five percent of County's total. Area 11 covers Auberry Road from just south of the accident location to the mountainous region around Shaver Lake. Conditions in Area 11 are different from the other areas because it is more mountainous. Area 7, which is just south of Area 11, is primarily an urban area that also includes farming.

*The Bicyclists*

On Sunday, March 19, 2017, Darren Cousineau, Kent Johnson and Mark Updegraff met plaintiff David Bray at his house, intending to ride their bicycles from Fresno to Bass Lake and back, a distance of approximately 55 miles. The weather was partly cloudy with no rain. Bray described the conditions as clear and dry. The group of four rode from Bray's house to Sherry's Roadhouse on Auberry Road using bike lanes without encountering any problems. The roadhouse was commonly used by cyclists as a destination for shorter rides and as a stopping place on longer rides. Cousineau described Auberry Road as an artery road that bicyclists use to get to more challenging roads at higher elevations.

At the roadhouse, Bray immediately recognized plaintiff Melissa Rose and started a conversation with her and her father, John Moore. Rose knew Bray and the other three, having ridden with them previously. During the conversation Bray learned Rose and her father were riding to Prather, the same direction as Bray. They decided to ride together

as a group. Meanwhile, Cousineau spoke with Tou Pha, another rider headed in the same direction, and Pha joined the group. The seven riders left the roadhouse, crossed Auberry Road, and took Auberry Road's northbound bike lane.

Bray estimated that he had ridden Auberry Road north of the roadhouse more than 30 times before the accident occurred. Rose also was familiar with the area. As part of her job with the school district, she drove Auberry Road to Foothill Elementary School and other schools in the area about five to 10 times a year. From December 2016 through the date of the accident, Rose had not ridden Auberry Road in the area of the accident but had driven that route.

From the time the group left the roadhouse until they reach the accident site, they rode in Auberry Road's bike lane and encountered no hazards or issues. The group rode in a formation referred to as a paceline, which is common. Riding in a paceline is a fundamental skill for road bike riders that allows them to ride predictably and safely in a single file. The first rider sets the pace and blocks some of the wind, allowing following riders to exert less energy. When the lead rider becomes fatigued, he or she leaves the line and works their way to the back of the line and the next rider takes the lead and sets the pace. Typically, the front wheel of a following rider is about one to two wheel diameters behind the back wheel of the rider ahead.[3] Bicyclists in a paceline are offset, rather than directly in line behind the rider in from of them. The amount of the offset varies, but usually is approximately six inches. Offsetting allows the following rider better visibility of the roadway ahead and can reduce the effects of a crosswind.

*The Sand and Accident*

As the group approached the accident site, Pha was the lead rider in the paceline. Pha had ridden in the area the week before the accident. When he got to the area where the sand was located, Pha gave a signal by pointing with his fingers to where the obstacle

---

[3]     The diameter of a wheel is approximately 27 inches.

was going to be. This signaling technique is used to alert the riders in back that they are approaching an object they should avoid. Pha testified that he had no problems getting around the sand.

Cousineau, the second rider in the paceline, was asked if he could recall how far away he was when he first recognized that the bike lane was blocked with sand. He answered:

> "Well, it happened very quickly. I don't know that I can give you a measurement distance-wise. But the reason is because the -- the sandbar was tapered. So, you know, as we approached it, it's kind of a very thin line against the gutter and then gradually and then very quickly filled up the entire bike lane. So as soon as we recognized there was a problem, there was a problem. And so it was very quick."

Cousineau testified that Pha, he and Rose's father, who was third in line, stayed in the bike lane until they approached the sand bar, took a quick look back to make sure there was no traffic, saw it was safe to go around the hazard, and went around it by going into the traffic lane between six and 12 inches from the bike lane stripe. Cousineau testified the sand bar created a hazard because it forced "bicyclists to leave the dedicated bicycle lane and move out into the vehicular traffic lane." As Cousineau went by the sand, he pointed with his finger and yelled "sand." Cousineau stated that approximately four to five seconds after he moved back into the bike lane, he heard a loud crunching sound, and the first three riders slowed down, looked back, and saw there had been an accident with riders down. Cousineau saw Rose lying in the roadway, moaning in pain. Rose's father and others assisted Rose out of the roadway over to the shoulder. By the time Cousineau made his way back to the accident scene, Bray had stood up and was holding his wrist. Bray had blood on his fingers and asked Cousineau for some Advil.

Rose testified that from the roadhouse to the accident scene she rode in the paceline behind her father. As the paceline approached the sand, Rose saw cyclists ahead of her signal with their hands to get over and she immediately started getting over. She

7.

then saw some of the sand as they were passing it and thought that it was the sand being referred to. When Rose passed that part of the sand bar, she was inside the bike lane between the sand and the white stripe. Rose kept going and tried to stay as close to the white line as she could. She thought she heard someone yell "car" and was not sure whether she touched some of the sand before or after hearing the warning. When Rose went into the sand, her bike lost traction, but she initially was able to maintain her balance. When she came in contact with more sand, Rose lost control and went down, falling into the roadway and landing on her left side. After Rose fell, she was hit by a car. Describing the interval between her fall and being hit by the car, Rose stated: "It happened so fast." The car pulled off to the side, but then drove away. Cousineau testified the car was a silver Nissan Sentra, and it pulled onto the shoulder about 180 feet from the accident scene and came to a complete stop before leaving. The driver of the car was never identified.

Bray rode in the paceline following Rose, approximately five feet behind her. When Bray became aware there was sand ahead, he veered to the left like Rose. Bray testified that "it didn't look to be any particular hazard at all from a distance. Not until I got right on top of it did I realize that there was a hazard." Bray saw Rose's back wheel move a little bit side to side and heard her say "whoa." Bray testified that "we both moved farther to the left to avoid the sand. And then in a flash she was going down." Around that time, Bray heard someone call out "car," a signal to other cyclists that a car was coming up from behind. Bray steered to the right into the sand to avoid Rose and the car, which caused him to lose control and fall. Rose was already on the ground when Bray was falling. Bray testified his fall happened so fast, he did not "know how [he] got on [his] feet or out of [his] pedals or any of that." The next thing he knew, he was standing holding his hand, which had taken the brunt of the fall.

Johnson was the sixth rider in the paceline, following Bray by two or three bicycle lengths. The accident happened before Johnson got to the sand. Johnson saw Rose lose

8.

control, fall into the roadway, and get hit by the car. Johnson got off his bike and walked up to the accident site.

Updegraff, the last rider, testified he was about 10 to 15 yards behind Johnson and about 20 to 30 yards behind Rose. Updegraff also stopped before he got to the sand. He got out his cell phone and called 911. While Updegraff was making that phone call, the car that hit Rose drove off and Updegraff was unable to get a picture of it.

*Post-Accident*

Cory Walczak, an officer with the California Highway Patrol (CHP), was notified by dispatch of a collision involving a bicyclist on Auberry Road. When he arrived at the scene, a fire truck and another CHP officer, Justice Jones, were there. The ambulance had already left. The CHP officers conducted an investigation. They spoke to the other riders, got statements from them, photographed the scene, and took measurements. Officer Walczak completed a traffic collision report that documented their findings. Officer Walczak's testimony about Vehicle Code sections that apply to bicyclists and the use of bike lanes is described in part IV.B. of this opinion.

During his testimony, Officer Walczak explained a series of photographs showing the area of the accident and the sand bar in the bike lane. The photographs showed the bike lane's white stripe was not covered by sand. They also showed a narrow trench the officers dug in the sand bar to measure its depth. In some places, the sand in the bike lane was seven inches deep and covered the four-inch high asphalt berm at the right edge of the bike lane. The officers also measured the sand bar's length and width, determining it was 99 feet long and 4 feet wide at its widest.

Carl Hall, Jr., supervises an Area 7 road crew. He responded to a call from the sheriff's dispatcher to clean up the sand in the bicycle lane, even though it was in Area 11. After arriving at the scene, Hall spoke with the CHP officers about what needed to be done. With Hall using a shovel and the officer following behind with a broom, it took them approximately 30 minutes to clean the bike lane. Photographs of the area after they

9.

finished showed a dark area in the bike lane where the sand had been moist. The dark area was surrounded by a lighter color where the sand had been dry. The officer also told Hall he wanted the entire length of Auberry Road swept the next day to deal with any other road deposits that might be there.

**PROCEEDINGS**

In June 2017, Rose filed a complaint against County alleging a dangerous condition of public property caused the bicycle accident. In August 2017, Bray filed a complaint against County, also alleging a dangerous condition of public property. County answered the complaints, asserting multiple affirmative defenses including reasonable implied assumption of the risk. In November 2017, the trial court consolidated the two actions based on the parties' stipulation.

Rose and Bray filed motions for summary adjudication of certain issues. In November 2018, the trial court denied the motions, concluding there were triable issues of material fact as to whether County violated section 835 and whether the primary assumption of risk doctrine applied.

The trial took 13 days, starting on January 23, 2019, and ending on February 20, 2019, when the jury returned its verdict. Plaintiffs' accident reconstruction expert, Rene A. Castaneda, evaluated the scene of the accident and estimated Rose's path in relation to the sand. Castaneda also collected data from the Garmin unit on Rose's bicycle and determined her speed was about 20 miles per hour three seconds before the accident. Castaneda concluded Rose first entered the sand a second before she fell, was in the sand for three tenths of a second, exited the first patch, entered the sand a second time, and fell 0.23 seconds later. He stated Rose's bicycle engaged the sand in such a way that the friction forces caused an unbalanced condition, resulting in her fall.

Cousineau testified as both a percipient witness and an expert witness about how and when the sand bar formed in the bike lane. Cousineau's qualifications as an expert witness and his opinions about the formation of the sand bar are addressed in part I of this

10.

opinion. Benjamin Medrano, a road bicycling safety expert retained by plaintiffs, testified the sand bar "was a dangerous situation" and was much larger than obstacles he had encountered while bicycling. Medrano testified cyclists could circumvent the sand bar by leaving the bike lane, "but there was a hazard of traffic." Medrano had no criticism of Bray's decision to steer right into the deeper sand to evade Rose and traffic.

After plaintiffs presented their evidence, County moved for nonsuit. The court denied the motion, concluding there were disputed issues of fact to be decided by the jury.

County's evidence included the testimony of Thomas Braun, a registered engineer who specializes in accident reconstruction, and Dr. Bong Walsh, an expert in human factors. Braun stated the sand was an obstruction for bicyclists and it was foreseeable that a bicyclist running into the sand would lose control. Braun testified that even a little sand can cause a rider to fall, "[d]epending on speed, steering and braking inputs." Braun agreed it would have been reasonable for Rose to stay in the bike lane if she could have done so safely, but to avoid the sand she needed to be on the white stripe or just into the northbound traffic lane.

Based on the photographs, Walsh concluded that the sand could be seen "from a fair distance" and the large surface area of the sand gave fair warning that it was something that should be avoided. He also stated the fact the asphalt berm on the edge of the bike lane disappeared into the sand indicated the depth of the sand, providing further information that a rider should go around the sand. Walsh testified that the entirety of the bike lane stripe was visible, which indicated a rider would not have to go very far into the roadway to go around the sand. He acknowledged that contrast is important to visual perception and stated that from certain distances "it would probably be difficult to tell whether the sand was touching the line or not." When asked if he had any criticism of Rose trying to go around the sand while staying in the bike lane, Walsh responded: "Well, frankly, yes. I mean, because the sand does cover the bike lane, so – and the

11.

riders in front of her had established a safe line around the sand that was not going far into the roadway. And so it just seems like if you follow that, then you're okay." In contrast, Walsh stated Bray's decision to turn into the sand to avoid Rose was reasonable.

Before closing argument, County moved for a directed verdict on the grounds that the court could determine as a matter of law that there was no dangerous condition and that liability was barred by immunities and the primary assumption of risk doctrine. The court denied the motion.

The trial court's jury instructions defining County's liability for a dangerous condition of public property were based on the Judicial Council of California Civil Jury Instructions (CACI) Nos. 1100 through 1104. Its jury instruction on the primary assumption of risk doctrine was based on CACI No. 472 and is quoted in part III.B.2. of this opinion. The special verdict form included 18 questions.

On February 20, 2019, the jury reached its verdict. The jury found County was 75 percent responsible for Rose's injuries, Rose was 25 percent responsible for her injuries, and the unknown driver was zero percent responsible. As to Bray's injuries, the jury found County was 70 percent responsible and Rose was 30 percent responsible. The jury determined Rose's and Bray's past and future economic and noneconomic damages totaled $189,007.81 and $209,882, respectively. After adjustments for comparative fault, County was liable to Rose for $141,755.86 and was liable to Bray for $161,882.

County filed a notice of intent to move for new trial and a notice of motion for judgment notwithstanding the verdict. In May 2019, the motions were argued before the trial court. Two weeks after the hearing, the court filed orders denying the motions. In June 2019, County filed a timely appeal.

**DISCUSSION**

I.     EXPERT TESTIMONY

Plaintiffs' cause of action alleging a dangerous condition of public property required them to prove that Auberry Road was in a dangerous condition at the time of the injury and that County "had notice of the dangerous condition for a long enough time to have protected against it."  (CACI No. 1100.)  Addressing how long the County had notice of the dangerous condition, Cousineau testified that, in his opinion, the sand bar had been in place since February 20, 2017, which was 27 days before the accident. Explaining this date, he stated that the last significant rainfall in the area occurred on February 20, 2017.

On the question of how the sand bar formed, Cousineau testified that, in his opinion, the sand bar formed through the process of erosion during the months of December through February.  Cousineau described erosion as a geological process where precipitation, flowing water and wind causes erodible material such as sediment and sand to move from one location to another.

County argues the admission of Cousineau's expert testimony constitutes reversible error because there was no basis in fact for his opinion about how and when the sand bar formed in the bike lane.  County refers to the principle that an " 'expert opinion is worth no more than the reasons upon which it rests' " (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 (*Jennings*)) and asserts Cousineau's opinions were purely conclusory because they were unaccompanied by a reasoned explanation connecting the factual predicates with the ultimate conclusion. We disagree.

A.     Legal Principles

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to

13.

which his testimony relates." (Evid. Code, § 720, subd. (a).) Such expert witnesses may present opinions that are "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and are based on matter "that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801.)

"The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772 (*Sargon*).) "In short, the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " (*Ibid*.)

Whether a witness qualifies as an expert in a particular field is addressed "to the sound discretion of the trial court." (*Brown v. Colm* (1974) 11 Cal.3d 639, 647.) Some decisions describe this discretion as "broad." (E.g., *People v. McDowell* (2012) 54 Cal.4th 395, 426; *Antelope Valley Groundwater Cases* (2020) 59 Cal.App.5th 241, 262.) Thus, appellate courts apply the abuse of discretion standard when reviewing a trial court's determination that a witness was qualified to present expert testimony. (*Brown v. Colm*, at p. 647 [exclusion of plaintiff's sole expert was a prejudicial abuse of discretion]; see *Sargon*, *supra*, 55 Cal.4th at p. 773.)

B.    Cousineau's Qualifications

Cousineau graduated from Clovis West High School in 1988 and graduated from California State University, Fresno in 1993 with a degree in environmental health

14.

science, with an emphasis in occupational health. Later, he obtained a master's degree in public health, with an emphasis in environmental health science, from California State University, Fresno. Cousineau is registered by the California Department of Public Health as an environmental health specialist.

After Cousineau obtained his undergraduate degree, he worked for the Fresno Metropolitan Flood Control District as an environmental resources technician for a few years and was promoted to a staff analyst position. He implemented provisions of the Clean Water Act (33 U.S.C. § 1251 et seq.) that require "municipalities, construction sites, and Caltrans to adhere to certain rules and regulations pertaining to storm water runoff from their properties." His work involved rainwater runoff along roadways and included "[h]ow water moves, how it is conveyed, where it is transported to," and the results of water movement.

After seven years with the Fresno Metropolitan Flood Control District, Cousineau worked five years for the California Department of Transportation (Caltrans) as the District 6 (Fresno area) storm water coordinator. In that capacity, he was responsible for developing specifications and plans for Caltrans construction sites, ensuring the specifications and plans were adhered to during construction, and ensuring they also were adhered to after construction (Caltrans calls postconstruction the maintenance period). Construction sites have disturbed soil, which is highly erodible and can be transported by rainfall into water bodies. The purpose of the federal legislation is to prevent that from occurring by ensuring construction sites implement effective erosion control and sediment migration practices.

Cousineau also took training courses related to construction site erosion control, coast construction site erosion, and roadway maintenance. The courses were given by the International Road Federation, Caltrans' headquarters, and Caltrans department of storm water management. Cousineau testified that these courses taught him part of what he knows about erosion.

15.

After his time at Caltrans, Cousineau went to work for the State Center Community College District. When he testified, Cousineau was the director of environmental health and risk management for the district and had 24 and a half years of experience.

Here we consider the question of whether Cousineau's testimony was sufficient to establish he was qualified as an expert on the subject of erosion, erosion control, and sedimentation. (Evid. Code, § 720, subd. (a).) To qualify as an expert, the witness must be shown to have "special knowledge, skill, experience, training, or education" about the subject on which expert testimony is offered. (*Ibid*.) The expertise of a witness is relative to the subject and is not subject to rigid classification based on formal education or certification. (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 294.) Thus, "no hard and fast rule can be laid down" for determining whether a witness has special knowledge, skill, experience, training, or education in the field such that his or her testimony would be likely to assist the jury in the search for the truth. (*Brown v. Colm*, *supra*, 11 Cal.3d at p. 645.) Consequently, whether a witness is qualified to testify as an expert must be judged on the facts of that particular case. (*Ibid*.)

We conclude Cousineau's own testimony provided an adequate basis for the trial court to determine he had special knowledge, experience, and training related to the subject of erosion, erosion control, and sedimentation. (See Evid. Code, § 720, subds. (a), (b).) Thus, the trial court did not abuse its discretion in concluding Cousineau qualified to testify as an expert about how the sand bar was formed through the process of erosion and the timing of its formation.

C.      Factual Basis for the Opinion

Next, we consider whether Cousineau's opinions were purely conclusory or, alternatively, were accompanied by a reasoned explanation of connecting the factual predicates with his ultimate conclusions about how and when the sand bar formed.

16.

Cousineau testified that the materials he reviewed in forming his opinions included (1) the deposition testimony of plaintiffs, David Bookwalter, Rick Dowell,[4] Carl Hall, Kent Johnson, Justice Jones, Tou Pha, Mark Updegraff, and Cory Walczak; (2) his deposition testimony; (3) weather data for the Fresno Air Terminal from the National Weather Service for the months of February through March 2017; (4) weather data from the National Oceanic and Atmospheric Association (NOAA) from the Auberry weather station for the months of October 2016 through April 2017; (5) the traffic collision report prepared by the CHP; (6) photographs from the accident scene; and (7) data from his bicycle's computer.

County contends these materials provide no evidentiary support for Cousineau's opinions and, "therefore, his conclusions and opinions are based on nothing but speculation." In particular, County states "Cousineau had not done any calculations, reviewed no plans of the roadway, performed no studies, and took no samples." County notes that Cousineau is not an engineer, never did any engineering calculations for his estimates, never determined how long the drainage area was, and did not know the volume of water that would be necessary to move the material into position.

First, County correctly notes that Cousineau was not an engineer. This fact, however, goes to his qualification as an expert and not the factual predicates for his opinion. We have already concluded that the trial court did not abuse its discretion in determining Cousineau qualified as an expert. (See pt. I.B., *ante*.) In other words, the fact Cousineau was not an engineer does not establish his opinions were "unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion." (*Jennings*, *supra*, 114 Cal.App.4th at p. 1117.)

---

[4]     Bookwalter was the road maintenance supervisor for Area 11. Dowell was the fire captain in charge of the fire crew at the accident scene.

17.

Second, County's argument about the lack of engineering calculations and the fact Cousineau performed no studies and took no samples implies these are *necessary* factual predicates for an opinion about how and when the sand bar formed. County has cited, and we have located, no authority for the principle that an opinion about erosion and sediment is reasonably explained only when supported by engineering calculations, studies or soil samples. Consequently, this argument does not establish that Cousineau's opinions were unaccompanied by a reasoned explanation connecting the factual predicates to his ultimate conclusion. (*Jennings*, *supra*, 114 Cal.App.4th at p. 1117.)

Lastly, we look at Cousineau's explanation for his opinion and determine whether his opinions were conclusory or, alternatively, were supported by the evidence. The evidence relied upon by Cousineau included his personal observations of the area on the day of the accident and his review of the CHP photographs. The photographs showed the type of soil and vegetation on the shoulder of Auberry Road next to the bike lane and the ground that slopes upward from the shoulder. That soil was higher than the bicycle lane, which is demonstrated by the photographs and is supported by the testimony that the four-inch asphalt berm separating the bike lane from the shoulder was covered by the sand bar. The photographs also demonstrate that the material forming the sand bar was wet. After Hall and the CHP officer removed the sand bar from the bike lane, the photograph clearly shows the area where the sand bar was widest was a darker color, indicating the sand was moist in that area, which supports the inference that the sand was moved there by water. As for the timing of the formation of the sand bar, Cousineau explained this conclusion by referring to rainfall data for the Fresno airport and Auberry weather station for the time preceding the accident.

We conclude Cousineau's opinions about how and when the sand bar formed in the bike lane were not "purely conclusory" as that term was used in *Jennings*, *supra*, 114 Cal.App.4th at page 1117. In other words, his opinions did not "rest on guess, surmise or conjecture." (*Ibid*.) Instead, Cousineau provided a reasoned explanation of

18.

the factual basis for his opinions, which allowed the jury to evaluate the merits of his opinions. As a result, the jury was informed how the facts, including the amount and timing of rainfall in the area, could support his conclusions. Thus, the jury was equipped to "decide whether it [was] more probable than not that the facts *do* support the conclusion urged by [Cousineau]." (*Ibid.*)

Consequently, we conclude the trial court properly determined "the matter relied on can provide a reasonable basis for [Cousineau's] opinion." (*Sargon*, *supra*, 55 Cal.4th at p. 772.) Therefore, the court did not abuse its discretion when it admitted Cousineau's opinion testimony.

## II. DANGEROUS CONDITION OF PUBLIC PROPERTY

### A. General Legal Principles

The Government Claims Act (§ 810 et seq.) is a comprehensive statute that defines the liabilities and immunities of public entities and public employees for torts. (*Cordova v. City of Los Angeles* (2015) 61 Cal.4th 1099, 1104–1105.) One type of liability is for injuries caused by a dangerous condition of public property.

Section 835 sets forth the exclusive conditions under which a public entity is liable for injuries caused by a dangerous condition of public property. It provides in relevant part: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes [1] that the property was in a dangerous condition at the time of the injury, [2] that the injury was proximately caused by the dangerous condition, [3] that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that [4] … [¶] … [¶] [t]he public entity had actual or constructive notice of the *dangerous condition* under Section 835.2 a sufficient time prior to the injury to have taken measures to *protect against* the dangerous condition." (§ 835, italics added.) The italicized terms are defined by statute.

19.

" 'Protect against' includes repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition." (§ 830, subd. (b).) " 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (*Id.*, subd. (a).) Conversely, "[a] condition is not a dangerous condition within the meaning of this chapter if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used." (§ 830.2.) For example, the state's failure to erect median barriers to prevent cross-median accidents might constitute a dangerous condition that results in liability. (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 68.)

The purpose of section 835 and the related provisions is "to impose liability only when there is a substantial danger which is *not* apparent to those using the property in a reasonably foreseeable manner with due care." (*Fredette v. City of Long Beach* (1986) 187 Cal.App.3d 122, 131 (*Fredette*).) Thus, while "it is foreseeable that persons may use public property without due care, a public entity may not be held liable for failing to take precautions to protect such persons." (*Id.* at p. 132.)

In addition, "[r]easonably foreseeable use with due care, as an element in defining whether property is in a dangerous condition, refers to use by the public generally, not the contributory negligence of the particular plaintiff." (*Mathews v. City of Cerritos* (1992) 2 Cal.App.4th 1380, 1384 (*Mathews*).) A particular plaintiff's contributory negligence is

a matter of defense and has no bearing on whether a dangerous condition existed in the first instance.  (*Ibid.*; *Fredette*, *supra*, 187 Cal.App.3d at p. 131.)

Generally, whether a given set of circumstances constitutes a dangerous condition poses a question of fact.  (*Biscotti v. Yuba City Unified School Dist.* (2007) 158 Cal.App.4th 554, 558 (*Biscotti*).)  However, the issue may be decided as a matter of law if no reasonable person could conclude the property's condition is dangerous under the statutory definition.  (*Id.* at p. 559.)  The plaintiff has the burden of proving a dangerous condition existed.  (*Ibid.*)

Several judicial decisions have concluded that an apparent hazard was not a dangerous condition for purposes of section 835.  In *Fredette*, the plaintiff was seriously injured when he dove off a pier into a shallow lagoon.  The appellate court affirmed the jury's verdict in favor of the defendant city because the danger of diving from the pier was apparent, and "no reasonable person could conclude that a swimmer, exercising due care and confronted with the notice that the condition itself provided, would have used the pier as a diving platform."  (*Fredette*, *supra*, 187 Cal.App.3d at p. 132.)

In *Schonfeldt v. State of California* (1998) 61 Cal.App.4th 1462, the appellate court upheld a judgment on the pleadings in favor of the defendant state.  The injured teenager, who was struck by a truck after climbing a freeway fence and running across the freeway, used the freeway "without due care in a manner which is not reasonably foreseeable."  (*Id.* at p. 1464.)

In *Mathews*, a child tried to ride his bike down a steep and slippery hill in a public park and crashed into a block wall.  The court upheld summary judgment for the city because "the danger of riding a bicycle down a very steep, wet, grassy hill is obvious from the appearance of the property itself, even to children exercising a lower standard of due care."  (*Mathews*, *supra*, 2 Cal.App.4th at p. 1385.)

In *Biscotti*, a nine-year-old boy used a chain link fence to prop his bicycle against and then stood on the bicycle to pick oranges.  (*Biscotti*, *supra*, 158 Cal.App.4th at

p. 557.)  The bicycle slipped when the boy was leaning over the fence; he fell onto the fence and was cut.  (*Ibid*.)  The trial court granted summary judgment to the defendant school district.  (*Id*. at p. 556.)  The appellate court affirmed the summary judgment because the boy did not use the fence with due care in a reasonably foreseeable manner.  (*Id*. at p. 557.)  Not only was use of the fence in that manner not reasonably foreseeable, any reasonable person using the fence as a prop would have appreciated the readily apparent danger.  (*Id*. at pp. 560–561.)

   B. <u>Reasonably Foreseeable Use with Due Care</u>

    *1.* *Contentions*

County's motions for directed verdict and for judgment notwithstanding the verdict contended that, as a matter of law, there was no dangerous condition as that term is defined in section 830 because the evidence was undisputed as to the obviousness of the hazard.  More specifically, County argues that "the evidence clearly establishes that no reasonable person would consider that the sand posed a substantial risk of injury when the property is used with due care in a reasonabl[y] foreseeable manner."  In County's view, riding through an obvious sand obstruction does not constitute an exercise of due care.

Plaintiffs contend the issue of whether the sand bar in the bike lane created a dangerous condition cannot be resolved as a matter of law because there was evidence that it posed a substantial risk of harm to reasonably foreseeable users exercising due care.  Plaintiffs refer to the testimony of County employees and the testimony of the other cyclists who were riding in the paceline.

In reply, "County asserts that the evidence presented clearly establishes that no reasonable person would consider that the sand posed a substantial risk of injury when the property is used with due care in a reasonabl[y] foreseeable manner *as a matter of law*."  County argues the evidence referred to by plaintiffs go to comparative negligence

and there is only one reasonable conclusion—namely, that the sand was an obvious danger and a cyclist using reasonable care would not ride through it. In County's view, a reasonable cyclist exercising due care would navigate around the sand or stop.

### 2. *Reasonably Foreseeable Users*

Initially, we consider who are the reasonably foreseeable users of the bike lane on Auberry Road. (See § 830, subd. (a) [definition of dangerous condition].) We undertake this inquiry because "[r]easonably foreseeable use with due care … refers to use by the public generally." (*Mathews*, *supra*, 2 Cal.App.4th at p. 1384; see *Fredette*, *supra*, 187 Cal.App.3d at p. 132 [court considered whether there was a "substantial risk of injury to *any* foreseeable user of the property exercising due care"].)

The evidence of foreseeable use by the public generally includes Section D of the transportation and circulation element of the Fresno County General Plan. That section recognizes bicycles are "a means of recreation, transportation, and healthful exercise." The stated goal of Section D is to "provide a safe, continuous, and easily accessible bikeway system that facilitates the use of the bicycle as a viable alternative transportation mode and as a form of recreation and exercise." Based on these provisions and the goals and policies of the Regional Bikeway Plan quoted earlier, we conclude the reasonably foreseeable users of the bike lane include (1) cyclists using it for transportation purposes and (2) cyclists engaging in recreation, exercise, or a combination of the two. As to the latter category, the testimony establishes that riding in a paceline is common. Therefore, we conclude it was reasonably foreseeable that cyclists using the bike lane would include groups of people riding in a paceline.

Another aspect of using the bike lane in a manner that "is reasonably foreseeable" (§ 830, subd. (a)) involves the weather and the time of day when the cycling is done. County asserts "weather was not an issue in seeing the sand in the bike lane as it was daylight, the weather was partly cloudy and the surface of the road was dry." County's

assertion, coupled with its failure to address other conditions, implies that these are the only conditions in which use of the bike lane is reasonably foreseeable, done with due care, or both. We reject this implication. First, the testimony shows that recreational night riding occurs. Second, it is reasonable to infer from the evidence that some cyclists, particularly commuters, will not always have clear, dry conditions in full daylight every time they use the bike lane.

Accordingly, we conclude it was reasonably foreseeable that members of the general public would use the bike lane in a variety of conditions. Some of those varying conditions would affect the visibility of the sand bar and, thus, the point at which a rider exercising due care would be able to determine the need to leave the bike lane to avoid the sand. In reaching these conclusions, we have adhered to the statutory directive that appellate courts "view[] the evidence most favorably to the plaintiff" when determining whether the risk to foreseeable users created by the condition was minor, trivial or insignificant as a matter of law. (§ 830.2.)

### 3. Risk of Use with Due Care

County's argument about use with due care asserts that a cyclist approaching the sand bar has two reasonable courses of action—either stopping or navigating around the sand by entering the roadway. County supports this argument by referring to the cyclists in the paceline who successfully chose one of these options, rather than the broader category of any reasonably foreseeable user.

The option of leaving the bike lane and merging into the roadway and the risks associated with that option were addressed in the testimony. Cousineau stated that the purpose of a bike lane is to separate bicycle traffic from motor vehicle traffic and, when a bike lane is blocked, cyclists are forced into the roadway and the two types of traffic are commingled. Medrano testified the sand bar "was a dangerous situation" that cyclists could circumvent by leaving the bike lane, "but there was a hazard of traffic."

24.

In general terms, a hazard that blocks a bike lane increases the risk of injury to bicyclists because merging into the roadway involves intermingling with motor vehicles traveling at a much greater speed than the bicyclists. The longer the blockage, the longer traffic is intermingled, and the longer bicyclists are subject to the risk that intermingling creates. Also, the risk of intermingling may be greater where the particular Class II bike lane is clearly marked and has been in use for two decades. In such a situation, both drivers and bicyclists expect to be separated and may act in a way that relies on that separation. Thus, a trier of fact evaluating the risks of the bike lane blockage could reasonably find that drivers of vehicles are less likely to anticipate having to safely intermingle with bicycle traffic than drivers on roads without a bike lane.[5]

With this background about the general use of bike lanes and the risks associated with blocking a bike lane, we turn to the sand bar that blocked the bike lane on Auberry Road. In *Fredette*, the court considered whether "the configuration of the lagoon at the time of the accident posed a substantial risk of injury to *any* foreseeable user of the property exercising due care." (*Fredette*, *supra*, 187 Cal.App.3d at p. 132.) Here, we consider whether the configuration of the roadway, bike lane, and sand bar at the time of the accident posed a substantial risk of injury to *any* foreseeable user of the property exercising due care. This evaluation addresses whether the dangers "were apparent to all users." (*Ibid.*)

The roadway, bike lane and sand bar are shown in the CHP photographs admitted into evidence. Photographs taken from the direction of bicyclists approaching the sand

---

[5] In *Mittenhuber v. City of Redondo Beach* (1983) 142 Cal.App.3d 1, the appellate court affirmed a judgment of dismissal entered after a demurrer was sustained to the bicyclist's claim that an intersection was dangerous. The court stated: "Many of the streets and highways of this state are heavily used by motorists and bicyclists alike. However, the heavy use of any given paved road *alone* does not invoke the application of Government Code section 835." (*Id.* at p. 7, italics added.) In this case, plaintiffs do not claim that heavy, intermingled use of the roadway, by itself, constituted a dangerous condition.

25.

bar show the width of the sand gradually increasing and, thus, narrowing the portion of the bike lane useable by cyclists. The photographs also show that the white stripe marking the bike lane is fully visible—that is, it is not covered by sand. Had the white stripe been covered, approaching riders could have easily seen they had to move into the traffic lane because they could not ride between the white line and the sand.

Cousineau testified that the sand bar was tapered—that is, it was "a very thin line against the gutter and then gradually and then very quickly filled up the entire bike lane." Cousineau was asked:

> "Did it appear to you as you approached the sandpile, before the moment you're describing where you realized that the sand tapered all the way out to the white stripe, where you were under the impression you might be able to safely navigate around it staying within the bike lane?"

Cousineau answered that he first thought it would be fine, but very quickly the entire bike lane was filled with sand and it was not an insignificant depth. Cousineau then recognized that it was an immediate hazard—that is, something his road bike could not traverse safely—and that is when he decided to move around it.

Based on the photographs and testimony, a trier of fact could reasonably find that a cyclist in the middle of a paceline approaching the sand with due care would not be given a clear indication that it was necessary to leave the bike line to avoid the sand until the rider was very close to the widest part of the sand bar. Similarly, a trier of fact could reasonably find that a motorist overtaking a paceline with due care would have his or her vision of the sand bar obstructed by the paceline and would not be able see that the cyclists would be squeezed into merging into the roadway until they made that maneuver.

Based on the surrounding circumstances, we cannot conclude as a matter of law that the risk created by the sand bar for bicyclists, which includes the unexpected intermingling of traffic, was trivial or insignificant when the roadway and bike line were used with due care by motorists and bicyclists. We recognize the random nature of the risk created by the bicyclist being forced to merge into the roadway. Not every paceline

26.

would reach the widest part of the sand bar when being overtaken by a motorist and fewer would be overtaken when there also is a vehicle in the southbound lane of traffic, which prevent the vehicle overtaking the paceline from moving across the centerline to give the bicyclists more room. The randomness of these events does not render the risk unforeseeable as a matter of law. Therefore, we conclude the trial court properly determined the issue presented a question of fact for the jury to decide. (See § 830.2.)

In closing our analysis, we note part of County's argument about the obviousness of the hazard created by the sand bar is premised on the assertion that a reasonable road bicyclist needs to "avoid any amount of sand on the roadway." We cannot accept the premise that *any* amount of sand is an obvious hazard because the record contains evidence that bicyclists can ride over some amounts of sand without unreasonably increasing the risk of a fall. For example, Medrano testified that he had encountered shovel fulls of sand that are short and "if you ride through them, you're okay." Also, Cousineau testified that "small amounts as shallow as half an inch or so could cause you to lose control of your bicycle if it's in the roadway." His testimony supports the inference that sand less than half an inch deep is unlikely to cause a loss of control. Braun, County's expert, did not give an *unqualified* opinion a little sand can cause a rider to fall. Instead, he stated it depended "on speed, steering and braking inputs." Because of the conflicting evidence about whether a bicyclist could not perceive the depth of the sand near the bike lane's stripe until they were close to it, it was not obvious, as a matter of law, to all reasonably foreseeable users exercising due care that they could not ride along the edge of the sand just inside the bike lane's white stripe.

III.    PRIMARY ASSUMPTION OF RISK

A.      The Duty of Care Element

Under California tort law, the elements of a negligence claim and a premises liability claim are the same: a legal duty of care, breach of that duty, and an injury

27.

proximately caused by that breach.  (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158.)  California's doctrine of primary assumption of risk addresses the duty of care element—specifically, it limits the duty owed by the defendant to prospective plaintiffs. (*Williams v. County of Sonoma* (2020) 55 Cal.App.5th 125, 128 (*Williams*).)  In the sporting context, the doctrine precludes liability for injuries arising from those risks deemed inherent in a sport.  (*Id*. at p. 129.)  Thus, as a general rule, a person or entity has no legal duty to eliminate a sport's inherent risks or otherwise protect a sports participant from those risks.  (*Ibid*.)  Nonetheless, California law recognizes a limited duty to sports participants—namely, a duty " 'not to unreasonably increase the risks of injury beyond those inherent in the activity.' "  (*Ibid*., quoting *Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1162 (*Nalwa*).)

The doctrine reflects a policy determination that certain defendants should not be responsible for protecting potential plaintiffs from particular harms.  (*Williams*, *supra*, 55 Cal.App.5th at pp. 128–129.)  The public policy for applying the primary assumption of risk doctrine in the sporting context is "to avoid chilling vigorous participation in or sponsorship of recreational activities by imposing a tort duty to eliminate or reduce the risks of harm inherent in those activities."  (*Nalwa*, *supra*, 55 Cal.4th at p. 1156.)

B.     Trial Court Proceedings

1.     *Motions*

County's motion for nonsuit argued County had no duty to protect plaintiff from the risks inherent in road cycling in a paceline where the risk cannot be eliminated without altering the fundamental nature of the activity and, therefore, the issue presented was "whether [County's] conduct substantially or unreasonably increased the inherent risk of the activity."  In arguing the motion, County recognized that whether its conduct increased the risks inherent in the activity was a factual question and argued that "when the facts are not in dispute and no reasonable juror could find otherwise, a nonsuit is

appropriate." The trial court determined the application of the primary assumption of risk doctrine to the facts of this case presented questions of fact for the jury. As a result, the court denied County's motion for nonsuit.

County's motion for directed verdict again raised the primary assumption of risk issue. The trial court stated: "Primary assumption of the risk applies in this case. However, there are disputed facts on whether or not the County has increased that risk, the inherent risk." Defense counsel then asked what facts were in dispute because there was no dispute that there was sand in the bike lane. The court agreed it was undisputed that sand was in the bike lane, "but there is dispute about the nature of the sand, the amount of sand" and whether it was beyond what is an inherent risk in bicycling. Defense counsel argued hazards are on the roadway every time a cyclist rides a bike, those objects are avoided all the time, and every object exposes cyclists to the risk of falling, and "[s]ize doesn't increase the risk. The risk was there." Rose's counsel argued the size of the sand bar does change the amount of risk and there was "no good argument that a sand pile that's this deep and this large is an inherent risk of riding your bicycle on the roadway." After hearing argument, the court restated its conclusion that whether the inherent risk was increased presented a question of fact for the jury.

### 2. Jury Instructions and Findings

Based on CACI No. 472, the trial court instructed the jury on the primary assumption of risk doctrine as follows:

> "Melissa Rose and David Bray claim that they were harmed while participating in road bicycling on a roadway controlled and maintained by the County of Fresno. To establish this claim, Melissa Rose and David Bray must prove all of the following:

> "One, that the County of Fresno controlled and maintained the roadway;

29.

"Two, that the County of Fresno unreasonably increased the risks to Melissa Rose and David Bray over and above those inherent in road bicycling;

"Three, that Melissa Rose and David Bray were harmed; and,

"Four, that the County of Fresno's conduct was a substantial factor in causing harm to Melissa Rose and David Bray."

The parties agreed to this version of the instruction. The parties had disputed the use of a prior version containing (1) the words "in a pace line" after the two references to "road bicycling" and (2) a different wording of the first element.

The special verdict form asked whether the County did "something or fail[ed] to do something that unreasonably increased the risks to [plaintiffs] over and above those inherent in road cycling." The jury answered, "Yes." The vote was eleven to one. In addition, the jury answered "No" when asked: "When you consider the likelihood and seriousness of potential injury, compared with (a) how much time and opportunity COUNTY OF FRESNO had to take action, and (b) the practicality and cost of protecting against the risk of injury, was COUNTY OF FRESNO'S failure to take sufficient steps to protect against the risk of injury created by the dangerous condition reasonable under the circumstances?"

C.    Proof an Inherent Risk Was Increased

To reiterate, County argues that there is no evidence it increased the risk of harm to bicyclists riding in a paceline. County asserts that obstacles in the roadway and bike lane, including sand, are recognized hazards of road cycling and the risks posed by such obstacles are part of the risks inherent in road cycling.

1.    *Background*

To reach the issue about whether an inherent risk was unreasonably increased, we make the same two assumptions made by the First District in *Williams*. First, the primary assumption of risk doctrine applies to claims against public entities for injuries caused by a dangerous condition of public property. (*Williams*, *supra*, 55 Cal.App.5th at p. 130.)

30.

Second, the group bicycle ride in which Rose and Bray participated constitutes a type of sports activity covered by the primary assumption of risk doctrine. (*Ibid*.)

We note *Williams* also discussed a third legal issue—whether the county owed the bicyclist the limited duty not to unreasonably increase the inherent risks of that sporting activity. (*Williams*, *supra*, 55 Cal.App.5th at p. 130.) That issue was raised by the county's argument that it had no role in cycling and no relationship to the plaintiff and, therefore, "it owe[d] no duty to avoid unreasonably increasing the inherent risks of her cycling activity." (*Id*. at p. 131.) The First District rejected this argument after analyzing whether imposing the limited duty would promote or undermine the policy goals of the primary assumption of risk doctrine. (*Id*. at pp. 130–133.) In this appeal, County has not raised the issue and, therefore, we conclude County owed the plaintiffs the limited duty not to unreasonably increase the inherent risks of road cycling. In other words, the trial court's jury instruction on the primary assumption of risk correctly stated the law.

### 2. *The Concept of an Inherent Risk*

Our analysis of County's argument is divided into two parts. The first addresses the concept of a sporting activity's inherent risk. We regard this issue as a question of law about the scope of the limited duty.

County's briefing asks: "If small amounts of sand in a bike lane is a hazard to cyclists, as the witnesses testified, why does the size and depth of the sand mean the County increased the risk? It would seem that sand in the bike lane is an inherent risk of long-distance recreational cycling and as a matter of law the size of the obstacle nor its depth changes that fundamental premise, particularly when cyclists can lawfully enter the drive lane to avoid the sand." County reiterated its contention, stating: "The presence of 'more' sand does not increase the risk and no affirmative act on the part of County increased the risk to [plaintiffs]." County's argument seems to imply that (1) increasing

31.

the risks inherent in a recreational activity means not adding a new risk and (2) obstacles and related falls are not a new risk for bicyclists.

In *Williams*, the court addressed whether the county breached its duty not to increase the inherent risks of long-distance, recreational cycling by failing to repair the pothole that caused plaintiff's fall. (*Williams*, *supra*, 55 Cal.App.5th at p. 133.) The county argued that falling and obstacles in the road were inherent risks of long-distance, recreational cycling and appeared to contend that *all* obstacles and related falls are inherent risks of the activity. (*Id.* at pp. 133–134.) The court rejected this argument, stating:

> "As explained in *Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 365, even though 'falling off a horse is an inherent risk of horseback riding[,] … if a person put a barrel in the middle of the Churchill Downs racetrack, causing a collision and fall, we would not say that person owed no duty to the injured riders, because falling is an inherent risk of horseback riding.' (Accord, *Jimenez v. Roseville City School Dist.* (2016) 247 Cal.App.4th 594, 610 ['We accept that unwanted contact with the floor is an inherent risk of any kind of dancing, because as a matter of common experience any dancer may slip, or dancers may collide, causing a fall. [Citations.] But that does not mean every time a dancer contacts the floor, it is because of an inherent risk of dancing.']; *Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 565 ['The discus, by its nature, involves launching a dangerous projectile. In the general sense, anyone within the area … is subject to some risk of being struck by the thrown discus. But … is the careless conduct of a participant in throwing the discus without first ascertaining the target area is clear an inherent risk of the sport? We think not.'].) By the same reasoning, a pothole so large as to 'pose a hazard to … [a]nything on the roadway' is a road obstacle, but is not an inherent risk of long-distance, recreational cycling." (*Williams*, *supra*, 55 Cal.App.5th at p. 134.)

Thus, the First District rejected the suggestion "that every road obstacle is an inherent risk of long-distance cycling." (*Williams*, *supra*, 55 Cal.App.5th at p. 134.) We join this legal conclusion and reject the argument that every obstacle is an inherent risk of road bicycling. As a result, while obstacles, including sand, in a bike lane are an inherent risk of long-distance, recreational cycling, we reject County's suggestion that sand in a

bike lane, regardless of the quantity present, never increases the inherent risk of a bicyclist falling. Stated from another perspective, we conclude falling because of sand is an inherent risk in road bicycling that can be unreasonably increased.

### 3. *Evidence of a Breach of the Limited Duty*

The second part of our analysis addresses County's argument about the sufficiency of the evidence. Under the basic principles that define tort liability and the primary assumption of risk doctrine, the existence of a duty and whether that duty was breached are separate elements. Our inquiry into the sufficiency of the evidence does not address the scope of the limited duty not to increase inherent risks. Instead, it considers whether a breach occurred because County *unreasonably increased* the inherent risk of road bicycling.

The parties recognize that there is a split of authority on whether a breach of the limited duty not to increase the inherent risks of a recreational activity presents a question of law or fact. "Some courts have held the jury decides whether the defendant's conduct increased the inherent risks of a sport. [Citations.] [¶] Other courts … have concluded that because the primary assumption of the risk doctrine involves issues of *duty*, the trial court determines both prongs of the duty analysis." (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 745; see *Williams*, *supra*, 55 Cal.App.5th at p. 134.) This split in authority is not important for purposes of this appeal because the parties and trial court agreed that a question of fact was presented in this case. County's reply brief states it "did not disagree that, despite the split of authority, the issue of increasing the risk of falling beyond that inherent in the activity is a question of fact." County also asserted: "This does not change the standard regarding a nonsuit or directed verdict as detailed in County's opening brief that the issue can be decided as a matter of law when no other reasonable conclusion is legally deducible from the evidence." Accordingly, we consider whether the factual question of whether County unreasonably increased the risk of a

bicyclist falling beyond that inherent in road bicycling can be decided in County's favor as a matter of law. Stated from the opposite point of view, does substantial evidence support the jury's factual finding that the sand bar in the bike lane unreasonably increased the risks inherent in road bicycling.

Initially, we note that the issue of an unreasonable increase in an inherent risk is related to the question of whether there was a dangerous condition of public property. In *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, the Supreme Court stated: " 'If the risk of injury from third parties is in no way *increased or intensified* by any condition of the public property … courts ordinarily decline to ascribe the resulting injury to a dangerous condition of the property.' " (*Id*. at p. 1137, italics added.) Here, the dangerous condition created by the sand bar increased the risks of intermingling with vehicular traffic and falling because it blocked the bike lane and put bicyclists in the position of having to merge into traffic to avoid the sand or ride over the edge of the sand to avoid traffic. The jury's determination that the increase in risk was unreasonable is supported by the length of time the hazard existed without being addressed (i.e., 27 days). Therefore, we cannot conclude as a matter of law that there was no unreasonable increase in the risks inherent in road bicycling.

IV.    JURY INSTRUCTIONS ADDRESSING NEGLIGENCE PER SE

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) The propriety of a proposed jury instruction is a question of law subject to de novo review on appeal. (*Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 617.) To obtain a reversal, an appellant must show an instructional error occurred and was prejudicial. (*Ibid*.; see Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

34.

A.    Proposed Instruction

County submitted a proposed jury instruction based on CACI No. 418, which addresses the presumption of negligence per se.  The statutory provisions included in County's proposed instruction were Vehicle Code sections 21200, 22107, 21208, and 21760.

Vehicle Code section 21200, subdivision (a)(1) states:  "A person riding a bicycle or operating a pedicab upon a highway has all the rights and is subject to all the provisions applicable to the driver of a vehicle by this division."

Vehicle Code section 22107 provides:  "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement."

The portion of Vehicle Code section 21208 quoted in County's proposed instruction states:  "(a) Whenever a bicycle lane has been established on a roadway pursuant to Section 21207, any person operating a bicycle upon the roadway at a speed less than the normal speed of traffic moving in the same direction at that time shall ride within the bicycle lane, except that the person may move out of the lane under any of the following situations:  [¶] … [¶]  (3) When reasonably necessary to leave the bicycle lane to avoid debris or other hazardous conditions."[6]

Vehicle Code section 21760 contains the Three Feet for Safety Act (Veh. Code, § 21760, subd. (a)), which sets forth requirements for drivers of a motor vehicle who, while driving on a highway, overtake a bicycle that is proceeding in the same direction.

---

[6]    Subdivision (b) of Vehicle Code section 21208, which was not included in the proposed instruction, provides:  "No person operating a bicycle shall leave a bicycle lane until the movement can be made with reasonable safety and then only after giving an appropriate signal in the manner provided in Chapter 6 (commencing with Section 22100) in the event that any vehicle may be affected by the movement."

35.

County's opening brief does not assert the refusal to instruct on this section constituted error and, therefore, this opinion does not discuss this section other than to note it does not impose any requirements on bicyclists.

After setting forth the Vehicle Code text, the proposed instruction stated: "If you decide [¶] 1. That Melissa Rose and/or David Bray violated any of these laws, and [¶] 2. That the violation was a substantial factor in bringing about the harm, then you must find that Melissa Rose and/or David Bray was negligent unless you also find that the violation was excused. [¶] If you find that Melissa Rose and/or David Bray did not violate this law or that the violation was not a substantial factor in bringing about the harm, then you must still decide whether Melissa Rose and/or David Bray was negligent in light of the other instructions."

The trial court refused to give County's proposed instruction based on CACI No. 418. In making a record of what occurred during the jury instruction conference held off the record, defense counsel stated:

> "As to 418, our position was and still is that Vehicle Code 21200(a) makes applicable code sections within that division. The division is Rules of the Road. Rules of the Road included Vehicle Code section 22107, 21208(a)(3), and 21760. [¶] During our conference Your Honor mentioned this would not be given, and we also asked for permission to propose separate instructions to be read for each of these code sections, and that also was declined."

> "So for our record then, we do note that the code sections relate to bicycle conduct under 21760. They do need to have a safe space, and they have to keep the same minimum space that vehicles do, 3 feet. Under 21208(a)(3), they may leave the bike lane to avoid debris or other conditions, and when they fail to do so, they have not taken advantage of that code section."

> "Under 22107, moving within a lane can be done only when done with reasonable safety. Given an appropriate signal, in the manner provided by this division of the Vehicle Code, the movements and directional travel of each of the Plaintiffs did not comply with that code section, and it does apply to bicyclists -- is our position."

36.

On appeal, County contends the trial court erroneously refused to give "instructions requested by County as it pertains to Vehicle Code section[s] 21200, 21208 and 22107." County asserts "[i]t is for the jury to decide how the facts apply to the law, but this jury was not allowed to consider that because the law was never given" and, absent the law, the jury could not properly decide the case and reach a verdict.

B.     Analysis

We do not consider whether the trial court erred in refusing to give a negligence per se instruction because the County's reply brief states County "is not making the argument as to negligence per se" but is arguing the trial court should have granted its request that the jury be instructed about the Vehicle Code provisions "separately from CACI 418."

Vehicle Code section 21208, subdivision (a) states that bicyclists "shall ride within the bicycle lane" and, when specified situations arise, the bicyclist "*may* move out of the lane." County's argument that the jury should have been instructed on this provision because the jury was ignorant of the law is not supported by the record. Officer Walczak was asked whether bicyclists are required to "always ride in the bike lane" and he answered, "[i]f there is one provided for them." Next, Officer Walczak was asked whether bicyclists are "allowed to move outside the bike lane" and he answered, "Yes." In a follow-up question, he was directed to turn to tab 443 in County's trial notebook, which contained Vehicle Code section 21208, and was asked whether "this code section permit[s] bicyclists to move outside the bike lane if there is some condition in the bike lane." He answered, "Yes."

Officer Walczak also testified that Vehicle Code section 21200 requires bicyclists "to adhere to the same laws as a motor vehicle" and he determined that Rose violated Vehicle Code section 22107, which prohibits unsafe turning movements. As a result of Officer Walczak's testimony, the jury was aware that, under the Vehicle Code, a bicyclist

37.

is allowed to move out of the bike lane, bicyclists are subject to the general rules of the road contained in the Vehicle Code, and Officer Walczak believed Rose made an unsafe turning movement in violation of one of the rules of the road. Thus, County's assertion that the jury was never given the law and, thus, "never had an opportunity to consider that … law of the state" was contradicted by the record.

In addition, during his closing argument, defense counsel referred to Officer Walczak's testimony and a Vehicle Code provision by stating: "Did the County require them to establish a certain path? No. [¶] Because the Vehicle Code, as we heard from Officer Walczak, allows cyclists to go outside the bike lane."

Based on the testimony and argument presented, we conclude the jury was aware of the law and, contrary to County's opening brief, was not "left … without a proper legal basis to find that Rose and Bray should have moved into the roadway and that the County was not liable." Also, the contention that County should *not be liable* because of a negligent failure to leave the bike lane makes little sense under California's system of comparative fault. (See generally, *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804.) Negligence by plaintiffs does not automatically lead to the conclusion that the defendant public entity has no liability for a dangerous condition of public property. (See *Fredette*, *supra*, 187 Cal.App.3d at p. 131 [plaintiff's contributory negligence is a matter of defense and has no bearing on whether a dangerous condition existed in the first instance].)

As a court of review, we infer the jury evaluated the argument rather than ignoring it. Stated from another perspective, County has cited nothing in the record to support the inference that the jury ignored the testimony of Officer Walczak and the argument of defense counsel. (See generally, *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [judgment is presumed correct and appellant must affirmatively demonstrate prejudicial error].)

Finally, we conclude County has failed to demonstrate the purported instructional error resulted in prejudice. The jury was aware of the Vehicle Code provisions and,

38.

therefore, it is not a reasonable probability that a jury instruction repeating information the jury already had would have resulted in a verdict more favorable to County.  (See *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 574 [test for prejudice].)

## DISPOSITION

The judgment is affirmed.   Respondents shall recover their costs on appeal.


                                                                          DE SANTOS, J.

WE CONCUR:


PEÑA, ACTING P. J.


MEEHAN, J.